[Cite as *State v. Broom*, 2012-Ohio-587.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 96747**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## ROMELL BROOM

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-196643

**BEFORE:**   S. Gallagher, J., Jones, P.J., and Keough, J.

**RELEASED AND JOURNALIZED:**   February 16, 2012

**ATTORNEYS FOR APPELLANT**

Timothy F. Sweeney
Law Office-Timothy Farrell Sweeney
The 820 Building, Suite 430
820 West Superior Avenue
Cleveland, OH   44113

S. Adele Shank
Law Office of S. Adele Shank
3380 Tremont Road
Second Floor
Columbus, OH   43221-2112

**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor

BY: Matthew E. Meyer
Assistant Prosecuting Attorney
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, OH   44113

SEAN C. GALLAGHER, J.:

{¶1} Defendant-appellant Romell Broom appeals the trial court's decision denying Broom's petition for postconviction relief.  For the following reasons, we affirm.

**{¶2}** Broom was convicted for the rape and murder of Tryna Middleton in 1985 and sentenced to death. Broom exhausted his appellate rights and faced execution on September 15, 2009. As of September 15, 2009, the state of Ohio had adopted procedures, practices, policies, and rules to guide the execution team in carrying out its statutory mandate in accordance with R.C. 2949.22. These procedures will be referred to as the "Protocols." The Protocols included the written protocol No. 01-COM-11, effective May 14, 2009, which has since been superseded. All executions are conducted at the Southern Ohio Correctional Facility in Lucasville, Ohio ("SOCF").

**{¶3}** Broom was transported to SOCF on September 14, 2009, in preparation for the next-day execution. Upon his arrival, the medical personnel conducted a physical examination of Broom, including the first of three, Protocol-required, venous assessments. These assessments were intended to monitor whether an intravenous line ("IV") could be placed and maintained during the execution. The staff noted potential concerns over the accessibility of Broom's veins in his left arm, but noted that his right arm would be amenable to IV access. Later that same day, the medical staff performed the second venous assessment, but only noted the fact that the assessment was completed. The third required assessment was either never performed or never recorded. It is undisputed that none of the completed assessments indicated that Broom's left-arm veins would be anything other than problematic, and none of the assessments indicated that the execution should be delayed.

{¶4} Broom's delayed execution began around 2:00 p.m. on September 15, 2009, because of some last minute legal attempts to stay the execution. In preparation for the lethal injection, the execution team attempted to establish two working IV catheters in Broom's peripheral veins. The Protocols suggested, but did not require, two IV catheters in case the primary catheter malfunctioned during the execution. The team made numerous, unsuccessful attempts to establish and maintain viable catheters. After 45 minutes, the team was ordered to take a break in order to confer. Ten to twenty minutes later, the team resumed their attempts to establish the IV catheter in Broom's biceps, forearms, and hands.

{¶5} At this point, a SOCF staff doctor who was not a member of the execution team appeared to assist the team in placing the IV catheters. The doctor tried placing the IV catheters on the top of Broom's foot and over his ankle bone. Neither attempt was successful, and Broom contends that the needle was pushed into his ankle bone. Almost two hours into the preparation, the execution team took another break and indicated that establishing IV access that day was not feasible. The director contacted Governor Strickland's office, and the governor signed a seven-day reprieve ending the execution attempt. During the course of the two hours, Broom received approximately 20 puncture wounds, some causing Broom to audibly react.

{¶6} Broom filed various motions and petitions in both state and federal court in response to the failed execution attempt. In Cuyahoga County C.P. No. CR-196643, Broom filed a motion for postconviction relief pursuant to R.C. 2953.21 and a declaratory

action seeking to "declare" any future attempts to execute Broom would violate his state and federal constitutional rights. Relying on the evidentiary submissions, the trial court denied Broom's petition prior to holding an evidentiary hearing. It is from this decision that Broom appeals, raising five assignments of error.

{¶7} Before addressing the merits of Broom's appeal, we are compelled to make the following observation. As noted by the Ohio Supreme Court, "'[r]easonable people of good faith disagree on the morality and efficacy of capital punishment, and for many who oppose it, no method of execution would ever be acceptable.'" *Scott v. Houk*, 127 Ohio St.3d 317, 319, 2010-Ohio-5805, 939 N.E.2d 835 (Stratton, J., concurring), quoting *Baze v. Rees*, 553 U.S. 35, 61, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008). As judges, we have our own personal concerns about capital punishment. Capital punishment, however, is constitutional, and the "Constitution does not demand the avoidance of all risk of pain in carrying out executions." *Id.* As Justice Frankfurter aptly noted, courts "must abstain from interference with State action no matter how strong one's personal feeling of revulsion against a State's insistence on its pound of flesh." *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 471, 67 S.Ct. 374, 91 L.Ed. 422 (1947) (Frankfurter, J., concurring). We are not debating the efficacy of Ohio's execution system or the possibility of eliminating all pain from the execution process. Our duty is to uphold the law and the Constitution. While we are conscious of the gravity of the matter before us, we can only address the issues properly before us.

**{¶8}** At the center of this appeal, we are presented with a simple question: Does the state have the right to subject Broom to a second execution attempt? The answer, despite the simplicity of the question, is far more complex. For this reason, Broom's assignments of error can be divided into three categories: procedural issues, constitutional issues, and state statutory issues. We will address Broom's assignments of error out of order where appropriate and combine any overlapping arguments.

## Standard of Review

**{¶9}** "[A] trial court's decision granting or denying a postconviction petition filed pursuant to R.C. 2953.21 should be upheld absent an abuse of discretion * * *." *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 58. The term "abuse of discretion" means "an unreasonable, arbitrary, or unconscionable action." *State ex rel. Doe v. Smith*, 123 Ohio St.3d 44, 2009-Ohio-4149, 914 N.E.2d 159, ¶ 15. It is "a discretion exercised to an end or purpose not justified by, and clearly against reason and evidence." (Citations and quotations omitted.) *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 130. "[A] reviewing court should not overrule the trial court's finding on a petition for postconviction relief that is supported by competent and credible evidence." *Gondor* at 390.

## Procedural Issues

{¶10} Broom's fifth assignment of error provides as follows: "The trial court erred when it denied Broom declaratory relief under Ohio Revised Code 2721.01 *et seq.* and Civ.R. 57." The trial court summarily denied Broom's request for declaratory relief. Broom's fifth assignment of error is without merit for the following reasons.

{¶11} Broom sought to overturn his death sentence as being unconstitutional through his petition for postconviction relief. His request for declaratory relief seeks nothing more than a declaration of the same and, in fact, was raised in the alternative. "A declaratory judgment action, however, cannot be used as a substitute for an appeal or as a collateral attack upon a conviction. Declaratory relief '* * * is [not] a substitute for appeal or post conviction remedies.'" *Moore v. Mason*, 8th Dist. No. 84821, 2004-Ohio-1188, 2005 WL 628512, ¶ 14, quoting *Shannon v. Sequeechi*, 365 F.2d 827, 829 (10th Cir.1966). Because his request for declaratory relief seeks the same remedy advanced through his petition for postconviction relief, we find that any declaratory relief sought was duplicative and, therefore, improper. The trial court did not err in denying Broom declaratory relief, and his fifth assignment of error is overruled.

{¶12} Broom's first assignment of error provides as follows: "The trial court erred when it denied Broom an evidentiary hearing on his post conviction and declaratory judgment claims." Broom argues that because of the five volumes of supporting documentary and other evidence filed with his petition, he is entitled to a hearing. The five volumes largely consist of the publically available evidence used in the course of

*Cooey v. Strickland*, S.D. Ohio No. 2:04-CV-1156, 2009 WL 4842393 (Dec. 7, 2009).

We disagree with Broom's argument.

**{¶13}** A trial court's decision to deny a postconviction petition without a hearing is also reviewed under the abuse of discretion standard. *State v. Abdussatar*, 8th Dist. No. 92439, 2009-Ohio-5232, 2009 WL 3155131, ¶ 15. R.C. 2953.21 (A)(1)(a), governing postconviction petitions, provides the following:

> Any person who has been convicted of a criminal offense * * * who claims that there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States, * * * may file a petition in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file a supporting affidavit and other documentary evidence in support of the claim for relief.

The trial court must determine whether there are substantive grounds for relief, when considering the supporting affidavit and other documentary evidence filed in support of the claim, prior to setting the matter for hearing. R.C. 2953.21(C) and (E).

**{¶14}** Broom cites *State v. Milanovich*, 42 Ohio St.2d 46, 325 N.E.2d 540 (1975), in support of his argument,

> which held that where the petitioner's claim is one which cannot be determined by an examination of the petition, files, or records of the case *and* which states a substantive ground for relief, the Court should proceed to a prompt evidentiary hearing * * *. (Emphasis added.) *State v. Rembert*, 8th Dist. No. 49422, 1985 WL 8124 (Oct. 10, 1985), citing *Milanovich*.

Because that proposition of law is stated in the conjunctive, there are two conditions that must be satisfied prior to the court holding a hearing: the petitioner must state substantive

grounds for relief, and the issue cannot be determined through a review of the record. This court, therefore, additionally recognized that trial courts are required to hold an evidentiary hearing only if the petitioner is relying on facts outside the record. *Id.*

{¶15} In this case, the state is not disputing the facts as advanced by Broom, leaving no issue of fact to be resolved at an evidentiary hearing. Broom also argues that he would have presented additional evidence at the hearing, but does not specify what additional evidence would have been introduced beyond the five volumes of documentary evidence filed. In fact, Broom concedes that "much of" the outside evidence was before the trial court, including the deposition testimony of the public members responsible for carrying out Broom's execution attempt and Broom's affidavit supplanting his sealed deposition testimony. Further, the parties attached copies of Judge Gregory Frost's lengthy federal court opinions, which largely recounted any additional evidence Broom would have included at a hearing. In fact, Broom conceded at oral argument that the trial court had enough evidence before it to find in his favor.

{¶16} We recognize this is a case of first impression and potentially of national importance. On the face of the petition and given the magnitude of the issues presented, we understand Broom's insistence on getting his day in court. It remains, however, that there are no factual disputes to resolve at an evidentiary hearing. The facts are known and accepted by the state. In this instance an evidentiary hearing was not required, further highlighted by the fact that the trial court's opinion focused on legal issues. The trial court based its decision on the undisputed and voluminous documentary evidence

properly before it and did not abuse its discretion in denying Broom's petition without conducting an evidentiary hearing.   Broom's first assignment of error is overruled.

## Constitutional Issues

{¶17} Broom's fourth assignment of error provides:   "The trial court erred when it found that a second attempt to execute Broom would not violate the prohibitions against being placed twice in jeopardy for the same offense in the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution."   Broom's fourth assignment of error is without merit.[1]

{¶18} Broom sought the overarching declaration that a second execution attempt would violate either the Fifth Amendment Double Jeopardy Clause or Eighth Amendment prohibition against cruel and unusual punishment per se.   The Supreme Court "has held that the Double Jeopardy Clause protects against three distinct abuses: a second prosecution for the same offense after acquittal; a second prosecution for the same offense after conviction; and multiple punishments for the same offense."   *United States v. Halper*, 490 U.S. 435, 440, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989); *Hudson v. United States*, 522 U.S. 93, 98-99, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997).

{¶19} Broom contends the third abuse, multiple punishments, is implicated in his case because it was through the state's failures that his execution could not proceed.   We

---

[1]Although Broom argues that multiple execution attempts and the execution team's conduct on September 15, 2009, violated both the United States and Ohio Constitutions, his substantive arguments are limited to alleged violations of the Fifth and Eighth Amendments to the U.S. Constitution.   Our analysis is accordingly limited.

disagree. Broom largely attacks the state's actions on the failed execution attempt and relies on the state's knowledge of problems in the execution procedures. The Fifth Amendment prohibition against double jeopardy does not focus on the state's action in effectuating punishments, rather the focus is on the punishment itself. The Fifth Amendment prohibits states from punishing a defendant twice for the same offense. On this point, a slight digression is in order.

{¶20} Broom was sentenced to death. The process he complains of, and what he endured was through the preparation to carry out a lawful sentence. The parties disagree on this point. The state argues the execution begins with the injection of lethal drugs. *See Resweber*, 329 U.S. at 477, 67 S.Ct. 374, 91 L.Ed. 422 (Rutledge, J., dissenting) (acknowledging that the Louisiana Legislature requires a single, continuous application of electricity to effectuate the death sentence as the basis for remanding the case to the trial court for a hearing on the evidentiary dispute regarding whether electricity was applied to the inmate). Broom essentially contends the preparation of the IV catheter constitutes the beginning of the execution attempt.

{¶21} In *Resweber,* an inmate sentenced to death was placed in the electric chair. When the executioner "threw the switch," the device malfunctioned and failed to deliver the necessary voltage to execute the inmate. The state of Louisiana terminated the execution attempt and granted a six-day reprieve. With a divided Supreme Court, four justices agreed that Louisiana's conduct of subjecting the inmate to multiple execution attempts did not violate the Fifth or Eighth Amendments. Four justices dissented, but

not before implicitly agreeing on one issue. The four dissenting justices would have remanded the case to the trial court for a determination of whether the state's conduct violated the constitutional prohibition against cruel and unusual punishment. *Id.* at 477. The dissent was silent on the double jeopardy issue. *See Broom v. Strickland*, S.D.Ohio No. 2:09-CV-823, 2010 WL 3447741 (Aug. 27, 2010) (noting that the justices disagreed over the application of the Eighth Amendment). This omission is instructive, and the dissent's language is equally availing.

{¶22} The *Resweber* dissent distinguished the application of electricity to the inmate from merely placing the inmate in the electric chair with no application of electricity. *Resweber* at 477. At the time, the Louisiana statute required a continuous application of electricity to cause the inmate's death. *Id.* The import was that the Louisiana state officials had a statutory duty to ensure that once the electricity was applied, that application must be continuous until the inmate's death. *Id.* at 476. In Broom's case, Ohio law, R.C. 2949.22(A), requires the state to apply a drug or combination of drugs of sufficient dosage to cause death. Applying this rationale, Ohio state officials have a statutory duty to ensure that once the drugs are applied, a sufficient dosage is injected to cause the inmate's death. For this reason, we cannot hold that establishing the IV access is part of the punishment of execution. For us to find that attempting to establish IV catheters constitutes the execution attempt would place the state in an untenable position. The state must be afforded discretion to determine

whether the IV access will allow the lethal drugs to flow until the inmate's death prior to starting the actual lethal injection.

{¶23} The state, therefore, has not yet punished Broom so as to implicate the Fifth Amendment prohibition against punishing an individual twice for the same crime. An inmate can only be put to death once, and that process legislatively begins with the application of the lethal drugs. R.C. 2949.22(A). We cannot adopt a bright-line rule based on the Fifth Amendment that prohibits the state from effectuating a death sentence after being unable to carry out the execution because of failings in the preparatory stages.

{¶24} For this same reason, we also hold that a second execution attempt cannot constitute cruel and unusual punishment per se solely on the fact that the inmate must endure a second execution attempt. We must decline to reach such a definitive conclusion. The state needs discretion in fulfilling Ohio's death penalty statutes. To hold to the contrary could invite the sort of needless pain and suffering that Broom seeks to avoid and likely would create a self-fulfilling prophecy. If the state were permitted only one chance at fulfilling its duty to execute an inmate, the pressure to complete the task could lead to violations of the Eighth Amendment. Therefore, in a case such as this, we must make the overarching declaration that multiple execution attempts do not implicate the Fifth Amendment's prohibition against double jeopardy or the Eighth Amendment per se.

{¶25} Courts cannot eliminate all pain from the execution process, and along the same lines, we must allow the state discretion to grant a temporary reprieve in situations that proceeding to execution could cause needless pain. We do agree that the state's use of multiple execution attempts needs to be tempered; however, this cannot be through the Fifth Amendment's Double Jeopardy Clause or through creating a per se Eighth Amendment violation. In the rare instance where the state attempts to execute an inmate on multiple occasions, the appropriate remedy is through the Eighth Amendment's prohibition against cruel and unusual punishment based on the case-specific inquiry. Broom's fourth assignment of error is overruled.

{¶26} Broom's second assignment of error provides: "The trial court erred when it found that the cruel and unusual punishment clauses of the Eighth and Fourteenth Amendments to the United States Constitution, and Article I, Sections 9 and 16 of the Ohio Constitution do not bar another attempt to execute Broom." Broom's second assignment of error is without merit.

{¶27} Broom primarily argues that the state willingly strayed from the Protocols, causing his execution attempt to be aborted, and that the repeated attempts to establish the IV access resulted in unconstitutional suffering.[2] According to Broom, these aberrations

---

[2]This Eighth Amendment claim must be distinguished from the equal protection claims most recently addressed in *In re: Ohio Execution Protocol Litigation*, S.D.Ohio No. 2:11-CV-1016, 2012 WL 84548 (Jan. 11, 2012), which granted a preliminary injunction against carrying out an inmate's execution based on the likelihood the state will deviate from the written protocols. Those deviations created an unequal treatment of the inmate from other similarly situated inmates. *Id.* The federal court specifically distinguished cruel and unusual punishment claims, which focus on severe pain, from equal protection claims and noted that the two claims do not overlap. *Id.*

transformed the constitutionally valid method into an unconstitutional execution attempt. Succinctly stated, he contends the state (1) failed to conduct the third venous assessment; (2) failed to implement backup plans to humanely execute inmates with poor venous assessments; (3) failed to ensure proper training of the execution team in accordance with the Protocols; (4) allowed the execution preparation to proceed for an excessive length of time and for an excessive amount of attempts at establishing the IV catheter; (5) allowed a non-execution team member to assist in the execution preparation; and (6) engaged in sporadic attempts to establish the IV catheter while allowing the execution team to take breaks. Further, Broom claims the circumstances were not unknown to the state. The state knew that problems with establishing the IV catheter arose in earlier executions, and the Protocols still failed to include an alternative.

{¶28} This is an issue of first impression in Ohio and nearly first impression in the United States. *Broom v. Bobby*, N.D.Ohio No. 1:10-CV-2058, 2010 WL 4806820 (Nov. 18, 2010). Never before has the state failed to execute an inmate after beginning the execution process. *Id.* There also is little federal jurisprudence on this issue. In *Resweber*, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422, the only other case dealing with a second execution attempt,

> [t]he Supreme Court held * * * that the Fifth and Eighth Amendments do not preclude a state from a second attempt at an execution[,] * * * however, "*Resweber* is a plurality decision in which there were not five justices who found that a second execution attempt did not offend the Eighth Amendment." *Id.*, quoting *Broom v. Strickland*, S.D.Ohio No. 2:09-CV-823, 2010 WL 3447741 (Aug. 27, 2010).

**{¶29}** We acknowledge the limited precedential value offered by *Resweber*, despite both parties' reliance on different aspects of the opinion. Broom seeks to distinguish his circumstances from those identified in *Resweber* because he claims that his ordeal was not from the technical failure, or "misadventure," found to be the cause in *Resweber*. Despite the limits of the *Resweber* opinion, *Resweber* and its progeny offer a persuasive framework.

**{¶30}** Before addressing this framework, it bears repeating that the Supreme Court has "never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment." *Baze*, 553 U.S. at 48, 128 S.Ct. 1520, 170 L.Ed.2d 420. In reviewing the history of the prohibition against cruel and unusual punishment, the Supreme Court noted that "[w]hat each of the forbidden punishments had in common was the *deliberate* infliction of pain for the sake of pain-'superadd[ing]' pain to the death sentence through torture and the like." (Emphasis added.) *Id.* at 48. An isolated occurrence during the execution process does not imply cruelty. *Id.* at 50. The Supreme Court

> observed [that] "[p]unishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel, within the meaning of that word as used in the Constitution. It implies there [is] something inhuman and barbarous, something more than the mere extinguishment of life." *Id.* at 49, citing *In re Kemmler*, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890).

**{¶31}** With that proposition in mind, we must separate Broom's second assignment of error into two categories: facial challenges to the Protocols and challenges based on state officials' actions on September 15, 2009.[3]

**{¶32}** We begin our analysis with Broom's post hoc facial challenges to Ohio's Protocols, specifically, Broom's complaint that the state failed to implement backup plans to humanely execute inmates with poor venous assessments, allowed the execution preparation to proceed for an excessive length of time, and engaged in sporadic attempts to establish the IV catheter while allowing the execution team to take breaks. The arguments essentially addressed the Protocols as they existed at the time of his execution date. The Protocols did not allow for a backup plan of execution or for a set time-limit within which to establish the IV catheters.

**{¶33}** Broom argues that the executions of Joseph Clark and Christopher Newton highlighted the state's awareness that establishing and maintaining IV catheters on certain inmates could be problematic and therefore the state should have had a backup execution method in place. In Clark's case in particular, the state attempted to establish an IV catheter 17 to 18 times and only successfully established one. During Clark's execution, it became clear that the one IV catheter established was not operating properly when the

---

[3]We separated Broom's constitutional arguments into their component pieces because the analysis differed between the facial, per se, and case-specific analyses. Broom, however, seems to be implicitly advocating for an accumulation-of-errors type approach that bases the constitutional analysis on the totality of circumstances surrounding the execution attempt; i.e., while no single error rises to the level of a constitutional violation, the errors in total violate the tenets of the Constitution. We decline to address Broom's argument in such a fashion as being unsupported by case or statutory authority.

first of three drugs was pushed. The execution team ceased pushing the drug mixtures and reestablished IV access. This process took over 45 minutes, but the team was able to complete the execution. Broom's argument is a double-edged sword. Just as the state was aware of problems with venous access, so was Broom prior to the September 15 execution attempt.

{¶34} Broom's challenge to the Protocols, in regard to the lack of a backup plan, should have been addressed prior to the execution attempt. We cannot look back at the constitutionality of a particular method after a problem arises. The appropriate time to challenge the method of execution is prior to the execution.

{¶35} More important, courts at every level continuously upheld Ohio's lethal injection procedure prior to the September 15 execution attempt. *See Cooey v. Strickland*, 610 F.Supp.2d 853 (6th Cir.2009); *Cooey v. Strickland* (6th Cir.2009), 589 F.3d 210, 227-228 (additionally concluding that the lack of a prescribed limit for the execution team to search for accessible veins is not unconstitutional); *Baze*, 553 U.S. at 35, 128 S.Ct 1520, 170 L.Ed.2d 420 (upholding Kentucky's lethal injection procedure, which was similar to Ohio's three-drug injection method). No reviewing court required any state, much less Ohio, to include a backup plan in order to pass constitutional scrutiny.

{¶36} Finally, Broom claimed that the state's allowing the execution preparation to proceed for an excessive length of time and engaging in sporadic attempts to establish the

IV catheter was unconstitutional. Neither of those actions is prohibited under the Protocols. To the contrary, the Protocols provided in pertinent part:

> The appropriate team member(s) shall make every effort to establish IV sites in two locations, and shall take the amount of time necessary when pursuing this objective. * * * The team members who establish the IV sites shall be allowed as much time as is necessary to establish two sites. If the passage of time and the difficultly of the undertaking cause the team members to question the feasibility of establishing two or even one site, the team will consult with the warden.

Therefore, in essence, these claims are also facial challenges to the Protocols, which should have been addressed prior to the attempt to execute Broom.

{¶37} Nonetheless, in *Baze*, the Supreme Court held that the one-hour time limit established by the Kentucky protocols was not excessive and noted that the execution team was not required to use the one-hour limit to establish the IV catheters continuously. *Baze* at 55. *Baze* is instructive. It first encourages the practice of attempting to locate veins in short blocks of time rather than continuously. Implicit in allowing sporadic attempts to establish the IV catheters is the concept that multiple "needle sticks" would be necessary.

{¶38} Broom also offered no basis to declare a two-hour time limit excessive. We see no reason to distinguish Broom's circumstances to the one-hour time limit upheld in *Baze*. *Id.* In that case, the one-hour time limit held to be constitutionally valid could be one hour of continuous or sporadic attempts to establish the IV catheter. While certainly there must be a limit imposed on the amount of time spent establishing the IV catheters, in light of *Baze*, we find that two hours of sporadic attempts to place and

maintain the IV catheters is not so excessive as to distinguish Broom's case from *Baze* and implicate the Eighth Amendment. The state did not spend an excessive amount of time attempting to establish the IV access, and the sporadic attempts to accomplish that task did not render the process unconstitutional. We accordingly find no merit to Broom's facial challenges to the Protocols.

{¶39} We next turn to Broom's challenges to the state's actions during the September 15, 2009 execution attempt. Broom asks us to review the facts of his case and divine that the violations of Protocol and the process of establishing the IV catheters was cruel and unusual punishment. Broom argued that what he suffered at the hands of the "awesome power of the state" constitutes cruel and unusual punishment because of his subjective suffering, an ordeal that could have been remedied by following the Protocols. The state disagreed and argued that in determining the validity of Ohio's and other states' execution methods, courts routinely discount the possibility of errors as being part of the process when resolving facial challenges. *See State v. Webb*, 252 Conn. 128, 143, 750 A.2d 448 (2000) (noting that the fact several needle insertions may be needed to effectuate a lethal injection does not render the procedure to be violative of the Eighth Amendment).

{¶40} Neither position offers a workable standard in the unlikely event that the state finds itself in a similar situation. Courts must be able to review violations and errors in the execution process and cannot circumvent tough issues on the theory that problems could occur during the execution process. The fact is that Broom's execution

went awry, and we must have a workable framework with which to review such unpleasant circumstances. "[I]t seems * * * important to be explicit regarding the criteria by which the State's duty of obedience to the Constitution must be judged. Particularly * * * when life is at stake." *Resweber*, 329 U.S. at 466, 67 S.Ct. 374, 91 L.Ed. 422 (Frankfurter, J., concurring).

**{¶41}** Relying on the parties' arguments and authority presented, the trial court put much emphasis on *Resweber* and its progeny dealing with the method of execution.[4] *Resweber* offers a workable framework, however based on a different line of cases. *Resweber* led to multiple branches of legal theory, two of which are pertinent to our discussion: (1) *Resweber* and its progeny dealing with the method of execution, for example, *Cooey v. Strickland*, 589 F.3d 210 (6th Cir.2009), and *Baze*, 553 U.S. at 35, 128 S.Ct 1520, 170 L.Ed.2d 420; and (2) *Resweber* and its progeny dealing with a condition-of-confinement claim, for example, *Wilson v. Seiter*, 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

---

[4]Typically, inmates challenging their execution as being cruel and unusual punishment, challenge the prospective method of the execution, i.e., the state's methodology in implementing the death penalty. *See id.*; *Cooey v. Kasich*, 801 F.Supp.2d 623 (S.D.Ohio 2011); *Cooey v. Strickland*, S.D.Ohio No. 2:04-CV-1156, 2009 WL 4842393 (Dec. 7, 2009); *Cooey v. Strickland*, 589 F.3d 210 (6th Cir.2009). Under that analysis, in order to constitute cruel and unusual punishment, an execution method must present a "substantial or objectively intolerable risk of serious harm." *Id.* at 50. Courts rely on the state's written protocols to ensure that the execution methods are not objectively intolerable. *See id.* at 55. In other words, the state implements written protocols to decrease the likelihood of human error that would cause unconstitutional pain and suffering during the execution. Courts, in turn, rely on the written protocols in determining whether the state's chosen methodology facially passes constitutional muster.

**{¶42}** Contrary to the parties' posturing, our inquiry is not limited to whether a substantial harm *can* occur based on the chosen methodology to execute Ohio's inmates, rather we must determine whether a substantial harm *did* occur in carrying out Broom's execution. As one federal court indicated,

> This is an important inquiry. If a court could never look beyond the facial constitutionality of an execution protocol when presented with evidence of improper administration, states could simply adopt constitutionally sufficient protocols * * * then flout them without fear of repercussion. *Dickens v. Brewer*, 631 F.3d 1139, 1146 (9th Cir.2011).

**{¶43}** In *Resweber*, the Supreme Court, in reviewing the case, assumed that the Fifth and Eighth Amendments of the Constitution applied to the state and that the state officials carried out their duties in a careful and humane manner as there was "no suggestion of malevolence." *Resweber*, 329 U.S. at 462, 67 S.Ct. 374, 91 L.Ed. 422. The Supreme Court specifically held:

> The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely. The fact that an unforeseeable accident prevented the prompt consummation of the sentence cannot, it seems to us, add an element of cruelty to a subsequent execution. *There [was] no purpose* to inflict unnecessary pain nor any unnecessary pain involved in the proposed execution. (Emphasis added.) *Id.* at 464.

**{¶44}** Justice Frankfurter, the critical fifth vote, agreed with the result, although concluding the Eighth Amendment did not apply to the states at that time. Justice Frankfurter found, based on the general notion of due process, that a proclamation of judicial clemency for a lawful sentence of death cannot be the remedy simply because the first attempt to carry out the punishment failed because of "an innocent misadventure."

A bright-line test is not necessary to uphold a principle of justice "[r]ooted in the traditions and conscience of our people." *Id.* at 471 (Frankfurter, J., concurring). This did not "mean that a hypothetical situation, which assumes a series of abortive attempts at electrocution or even a single, cruelly willful attempt, would not raise different questions." *Id.*

**{¶45}** The repeated references to accidents and innocent misadventures in *Resweber* set the foundation of a subjective state-of-mind requirement on state acts or omissions. Even the *Resweber* dissent recognized such. The dissent focused on the Louisiana statute that required a single, continuous application of electricity to cause the inmate's death. *Id.* at 477 (Rutledge, J., dissenting). The dissent would have found that the second attempt would require the executioner to intentionally apply a second application of electricity, which would have violated Louisiana law.

**{¶46}** The Supreme Court later officially recognized that "[b]ecause the first [execution] attempt [in *Resweber*] had been thwarted by an 'unforeseeable accident,' the officials lacked the culpable state of mind necessary for the punishment to be regarded as 'cruel,' regardless of the actual suffering inflicted." *Wilson*, 501 U.S. at 297, 111 S.Ct. 2321, 115 L.Ed.2d 271; *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Therefore, in order to determine whether deviations from the Protocols or the subjective pain endured by Broom from the countless "needle sticks" constitutes cruel and unusual punishment, we must inquire into the state actor's state-of-mind. "The source of the intent requirement is * * * the Eighth Amendment itself, which bans only

cruel and unusual *punishment*. If the pain inflicted is not formally meted out as *punishment* by the statute or the sentencing judge, some mental element must be attributed to the inflicting officer before it can qualify." (Emphasis sic.) *Wilson* at 300.

**{¶47}** Broom's case is more analogous to *Resweber* and its progeny dealing with a condition-of-confinement claim, which challenges deprivations that were not specifically part of the punishment but were nonetheless suffered during execution of the punishment. *Wilson* at 297. The Protocols are specifically drafted to ensure that Ohio's execution procedures satisfy the Eighth Amendment. *See Cooey v. Kasich*, 801 F.Supp.2d 623 (S.D.Ohio 2011). Therefore, deviations from the Protocols are not specifically part of the punishment of execution.

**{¶48}** Because we must review the intent of the state official, we must determine what standard to apply in resolving whether the state official had the requisite intent to cause unnecessary pain. In order to review this issue, we adopt the "deliberate indifference" standard developed for conditions-of-confinement claims and first articulated in *Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251. *Wilson* at 303.[5] "[D]eliberate indifference to [the] needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Gamble* at 104, citing *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). An

---

[5]We acknowledge that in certain situations, such as excessive force claims, the Supreme Court has instituted the higher standard of care of establishing the state official applied force "maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). In light of the fact that the Protocols protect the sanctity of the Constitution, any deviations from those Protocols should not be subjected to such a high standard.

accident, inadvertent failure, or even negligent behavior, although it produced added anguish, cannot be characterized as wanton infliction of unnecessary pain on that basis alone. *Id.* "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference * * *." *Id.* at 106; *Farmer v. Brennan*, 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).

{¶49} The deliberate indifference standard, while entailing something more than negligence, is less than acts or omissions for the very purpose or intent of causing harm or with the knowledge that harm will result. *Brennan* at 835. On this point, the trial court was correct to note that there is a "continuum of possible events" and at some point along that continuum, certain circumstances will lead to constitutional violations. "With deliberate indifference lying somewhere between the poles of negligence at one end and purpose, intent, or knowledge at the other, [courts] have routinely equated deliberate indifference with recklessness." *Id.* at 836. Thus, the term "deliberate indifference" was defined as "requiring a showing that the official was subjectively aware of the risk." *Id.*

{¶50} In *Brennan*, the Supreme Court specifically addressed the argument that the term deliberate indifference could involve an objective inquiry. In that case, the petitioner challenged whether the prison official's deliberate indifference to his safety constituted cruel and unusual punishment. *Id.* at 828. *Brennan* teaches that the criminal recklessness standard is the appropriate standard and differentiated the civil recklessness standard that uses a more objective inquiry. *Id.* at 836. Therefore, in order to determine

whether the state actor's conduct constituted cruel and unusual punishment, the proper determination is whether the state actor disregards a risk of harm of which he is aware. *Id.* "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned" as a violation of the Eighth Amendment. *Id.* at 837. In simplistic terms, we must look at what the state actors knew and when did they know it.

**{¶51}** Broom's argument claims the state failed to follow its Protocols and those violations led to added anguish during the September 15, 2009 execution attempt. Broom identified several deviations that caused his suffering: specifically, the state failed to conduct the third venous assessment; failed to ensure proper training of the execution team in accordance with the Protocols; allowed a non-execution team member to assist in the execution preparation; and attempted to establish the IV catheters an excessive amount of times. All these deviations were alleged to add to the subjective pain Broom endured in the repeated attempts to establish the IV access.

**{¶52}** Even when we presume that the deviations occurred and that Broom subjectively suffered physical and emotional distress, Broom's entire focus is on the undesirable outcome of the failed execution attempt based on the objective standard that any deviation from the Protocols or approximately 20 attempts to establish the IV catheters led to a constitutional violation. We must instead focus on the subjective mind-set of the state officials.[6] Indeed, Broom does not allege any deliberate

---

[6]We are conscious of the dissent's position that we are retroactively applying a new standard

indifference on the part of the specific state actors who made the decision to deviate from the Protocols other than the unsupported assertions that the state deliberately acted. Broom has not alleged that the specific state officials were subjectively aware of the risks to him when deviating from the Protocols or attempting to establish the IV catheters. Such omission is dispositive.

{¶53} The burden of stating a substantive ground for relief in his petition for postconviction relief rested with Broom. That an unfortunate outcome manifested after several violations of the Protocols or that Broom had to endure multiple attempts to establish the IV catheter is insufficient, standing alone, to substantiate the claim that the state officials in charge of effectuating Broom's death sentence demonstrated a deliberate indifference to Broom's rights. We by no means condone the state's failure to abide by the very protocols that ensure the execution process comports with the Eighth Amendment. However, under these specific facts, Broom has failed to allege that the state officials acted with the requisite mental state and therefore the trial court did not err in denying his petition for postconviction relief. Broom's second assignment of error is accordingly overruled.

---

of review; however, we must confine our analysis to the issues before us. Broom had every opportunity to advance any legal arguments in support of his claim. The fact that we applied the well-established deliberate indifference standard, while Broom advanced other arguments, does not necessitate further review by the trial court.

**State Statutory Issues**

{¶54} Broom's third assignment of error provides: "Broom's rights under Ohio Revised Code 2949.22(A), Article I, Sections 1, 2, 8, 9, 10, and 16 of the Ohio Constitution, and the Due Process Clause of the United States Constitution were violated when the state failed to conduct Broom's execution attempt on September 15, 2009[,] in conformity with Ohio law." Broom argues that R.C. 2949.22(A) establishes his right to a quick and painless death, a right that must be afforded due process protections.

{¶55} R.C. 2949.22(A) provides in pertinent part: "* * * a death sentence shall be executed by causing the application to the person, upon whom the sentence was imposed, of a lethal injection of a drug or combination of drugs *of sufficient dosage to quickly and painlessly* cause death. The application of the drug or combination of drugs shall be continued until the person is dead." (Emphasis added.) The statute facially requires the state to use an amount of drugs sufficient to cause a quick and painless death but does not require the same for the entire process. In fact, Broom has not identified any authority for the proposition that this guaranty extends to all aspects of the execution process.

{¶56} To the contrary, one court has already determined that the statute did not create a liberty and property interest in a quick and painless execution protected by the Due Process Clause. *Cooey*, 589 F.3d at 234. Because of our above observation and the persuasiveness of the *Cooey* holding, we find that the trial court did not abuse its discretion in denying Broom's petition for postconviction relief pursuant to R.C. 2949.22(A). Ohio law, R.C. 2949.22(A), does not create a right to a quick and painless

execution process, only a right to have a sufficient dosage of drugs to cause a quick and painless death. Broom did not receive any drugs, prior to the governor's issuing his reprieve, to even implicate R.C. 2949.22(A). Broom's third assignment of error is overruled.

**Conclusion**

{¶57} The trial court did not abuse its discretion in denying Broom's petition for postconviction relief based on the voluminous, undisputed evidentiary submissions. In order to establish that the first execution attempt violated the Eighth Amendment, an inmate in Broom's position must establish that the state officials were deliberately indifferent to his constitutional rights. Absent such a showing, a trial court does not abuse its discretion in denying postconviction relief. Finally, a second execution attempt does not violate the Fifth Amendment prohibition against double jeopardy.

{¶58} The decision of the trial court is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


SEAN C. GALLAGHER, JUDGE

LARRY A. JONES, P.J., CONCURS;
KATHLEEN ANN KEOUGH, J., DISSENTS WITH SEPARATE OPINION


KATHLEEN ANN KEOUGH, J., DISSENTING:

{¶59} I respectfully dissent. I would sustain Broom's first assignment of error and remand the matter to the trial court to conduct a hearing on Broom's petition. The decision to hold a hearing on a postconviction petition lies with the trial court, the gatekeeper of the evidence, and the trial court's decision to not hold a hearing will not be disturbed absent an abuse of discretion. *Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, at ¶ 60.

{¶60} I agree with the majority that the state did not dispute the facts presented by Broom and that Broom's petition includes voluminous records, depositions, affidavits, and federal court opinions. However, I disagree with the majority's conclusion that an evidentiary hearing was not required because "the trial court's opinion focused on legal issues."

{¶61} First, the trial court did not address all the legal issues raised in Broom's petition. His petition challenged that a subsequent execution attempt will be a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. Specifically, Broom contended that the State's deviations from its Protocols caused the first execution attempt to be aborted and that the State's repeated attempts to establish the IV access resulted in unconstitutional suffering. The trial court did not specifically identify or address Broom's challenge, other than to make a blanket declaration that

"Broom's constitutional claims must fail." Because Broom's challenge was fact specific, it required more than a mere legal conclusion. Given the importance of the issue and the impact this case has had on other death row inmate cases, I would find that the failure to conduct a hearing under these circumstances was unreasonable and arbitrary.

{¶62} I recognize that the trial court could reach the same conclusion after hearing on remand. However, and because the record is created and established at the trial court level for all subsequent reviewing courts, the trial court should develop the most thorough record possible to afford meaningful appellate review, especially considering that the issues presented in this case are those of first impression in Ohio. Accordingly, I respectfully dissent.

{¶63} Although I would reverse the trial court and remand the matter for a hearing, I am compelled to comment on the majority's decision to adopt the "deliberate indifference" standard in determining whether the State's violations of its Protocols during its execution attempt violate the Eighth Amendment's protections against cruel and unusual punishment.

{¶64} The majority's opinion thoroughly discusses the issues, legal history, and rationale for the standard. However, I disagree with the majority's decision to apply this standard to the facts of this case and to Broom's petition as submitted. I would remand the matter to the trial court to allow the parties to brief the issue and provide any relevant evidentiary materials addressing the "deliberate indifference" standard. I find that

applying this standard to this case retroactively without allowing Broom an opportunity to set forth an argument deprives him of meaningful consideration of his petition.

{¶65} The majority repeatedly stresses that Broom did not satisfy his burden of stating substantive grounds for relief on his claim that the state acted with "deliberate indifference" in its execution attempt. Specifically, the majority concludes that "* * * Broom has failed to allege that the state officials acted with the requisite mental state and therefore the trial court did not err in denying his petition for postconviction relief." I find that it is difficult to set forth allegations and facts to satisfy a standard that has yet to be adopted by a court on a case and issue of first impression. By applying this standard retroactively, finding that "Broom failed to allege" the requisite facts to prove this standard, the majority deprives Broom of his day in court and a fair opportunity to comply with this court's newly-adopted standard of reviewing such Eighth Amendment challenges. Furthermore, this de novo application goes beyond this court's abuse of discretion standard of review.

{¶66} Lastly, the magnitude of the ultimate outcome of this case cannot be overstated. It has been suggested that it was the State's failure to follow its own Protocols in this case that resulted in the botched execution attempt of Broom and the subsequent re-writing of its Protocols. It is my hope that the issue before this court is one that no other death row inmate will have to raise before any other court. However, history has a habit of repeating itself. In 1946, Willie Francis first raised the issue in Louisiana, and in 2009, history repeated itself with Romell Broom in Ohio. Given the

state of Ohio's record of not following its own rules and Protocols, history could very well repeat itself again.

**{¶67}** I agree with the majority that personal feelings need to be put aside when courts consider issues pertaining to the death penalty; however, I am mindful that the State's repeated failure to follow its own Protocols is personal to the families of the victims and the inmate for closure. The people of the state of Ohio, and specifically the families of victims, deserve to feel confident that if the State is going to continue to impose the death penalty, it will perform its obligations error free.

_____