[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Broom,* Slip Opinion No. 2016-Ohio-1028.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-1028

THE STATE OF OHIO, APPELLEE, *v*. BROOM, APPELLANT.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Broom,* Slip Opinion No. 2016-Ohio-1028.]**

*Criminal law—Death penalty—Eighth Amendment prohibition against cruel and unusual punishments and Fifth Amendment prohibition against double jeopardy—Cruel and Unusual Punishments and Double Jeopardy Clauses of U.S. and Ohio Constitutions do not bar state from carrying out death penalty after prior unsuccessful execution attempt—Trial court did not abuse its discretion in denying postconviction petition without additional discovery or evidentiary hearing—Court of appeals' judgment affirmed.*

(No. 2012-0852—Submitted June 9, 2015—Decided March 16, 2016.)

APPEAL from the Court of Appeals for Cuyahoga County, No. 96747, 2012-Ohio-587.

_____

LANZINGER, J.

{¶ 1} In this case, we are asked to determine whether the state is barred by the Cruel and Unusual Punishments and Double Jeopardy Clauses of the United

States and Ohio Constitutions from carrying out the death penalty against Romell Broom when attempts to insert an IV catheter were unsuccessful in an earlier scheduled execution. We hold that the state is not barred from carrying out his execution and therefore affirm the judgment of the court of appeals.

**Case Background**

{¶ 2} On October 3, 1985, a jury convicted appellant, Romell Broom, of aggravated murder with two felony-murder specifications (kidnapping and rape) in connection with the death of 14-year-old Tryna Middleton. Broom received a sentence of death, which was affirmed on appeal. 40 Ohio St.3d 277, 533 N.E.2d 682 (1988). After Broom exhausted his postconviction and federal remedies, this court ordered the execution to proceed on September 15, 2009. 123 Ohio St.3d 114, 2009-Ohio-4778, 914 N.E.2d 392, ¶ 21 and fn. 2.

*Facts of September 15, 2009*

{¶ 3} Broom was transported to the Southern Ohio Correctional Facility ("Lucasville") on September 14, 2009, in anticipation of his execution scheduled for the next day. Upon his arrival at Lucasville, a nurse and a phlebotomist conducted a vein assessment and found that Broom's right-arm vein appeared accessible, but his left-arm vein seemed less so. Prison officials communicated this information to Edwin C. Voorhies Jr., the regional director for the Office of Prisons of the Ohio Department of Rehabilitation and Correction ("ODRC"), and the medical team assured him that this would not present a problem.

{¶ 4} At 1:59 p.m. on September 15, the warden finished reading the death warrant to Broom. One minute later, Team Members 9 (a female) and 21 (a male) entered the holding cell to prepare the catheter sites.

{¶ 5} Team Member 9 made three attempts to insert a catheter into Broom's left arm but was unable to access a vein. At the same time, Team Member 21 made three unsuccessful stabs into Broom's right arm. After a short break, Member 9

made two more insertions, the second of which caused Broom to scream aloud from the pain.

{¶ 6} Member 21 managed to insert the IV catheter into a vein, but then he lost the vein and blood began running down Broom's arm. When that occurred, Member 9 rushed out of the room, saying "no" when a security officer asked if she was okay.

{¶ 7} Director Voorhies testified that he could tell there was a problem in the first 10 to 15 minutes. Warden Phillip Kerns saw the team make six or seven attempts on Broom's veins during the same 10- to-15-minute period. According to Kerns, the team members did hit veins, but as soon as they started the saline drip, the vein would bulge, making it unusable.

{¶ 8} About 15 minutes into the process, Kerns and Voorhies saw Member 9 leave the holding cell. Voorhies described her as sweating "profusely" and heard her say that she and Member 21 had both accessed veins, but the veins "blew." Member 17 then entered the holding cell and made "several attempts" to access a vein in Broom's left arm. Simultaneously, Member 21 continued his attempts on Broom's right arm.

{¶ 9} Terry Collins, who was then the director of the ODRC, called a break about 45 minutes into the process to consult with the medical team. The break lasted 20 to 25 minutes. The medical team reported that they were gaining IV access but could not sustain it when they tried to run saline through the line. They expressed "clear concern" about whether they would get usable veins. But because they said that there was a reasonable chance of establishing venous access, the decision was made to continue.

{¶ 10} By this time, Broom was in a great deal of pain from the puncture wounds, which made it difficult for him to move or stretch his arms. The second session commenced with three medical team members—9, 17, and 21—examining Broom's arms and hands for possible injection sites. For the first time, they also

began examining areas around and above his elbow as well as his legs. They also reused previous insertion sites, and as they continued inserting catheter needles into already swollen and bruised sites, Broom covered his eyes and began to cry from the pain. Director Voorhies remarked that he had never before seen an inmate cry during the process of venous access.

{¶ 11} After another ten minutes or so, Warden Kerns asked a nurse to contact the Lucasville physician to see if she would assess Broom's veins and offer advice about finding a suitable vein. Broom later stated that he saw "an Asian woman," whom he erroneously identified as "the head nurse," enter the chamber. Someone handed her a needle, and when she inserted it, she struck bone, and Broom screamed from the pain. At the same time, another team member was attempting to access a vein in Broom's right ankle.

{¶ 12} The Lucasville physician confirmed that she came to Broom's cell, examined his foot, and made one unsuccessful attempt to insert a needle but quickly concluded that the effort would not work. By doing so, she disobeyed the warden's express instructions to observe only and not get involved. The physician examined Broom's foot but could see no other vein.

{¶ 13} After the physician departed, the medical team continued trying to establish an IV line for another five to ten minutes. In all, the second session lasted approximately 35 to 40 minutes.

{¶ 14} During the second break, the medical team advised that even if they successfully accessed a vein, they were not confident that the site would remain viable throughout the execution process. The governor's office had signaled its willingness to grant a reprieve, and so the decision was made to halt the execution for the day.

{¶ 15} Dr. Jonathan Groner examined and photographed Broom three or four days afterward. The photographs show 18 injection sites: one on each bicep, four on his left antecupital (forearm), three on his right antecupital, three on his left

4

wrist, one on the back of his left hand, three on the back of his right hand, and one on each ankle. Prison officials later confirmed that he was stuck at least 18 times.

{¶ 16} Dr. Mark Heath met with Broom one week after the event. Dr. Heath observed "considerable bruising" and a lot of "deep and superficial" tissue damage consistent with multiple probing. Dr. Heath also posited that the actual number of catheter insertions was much higher than the number of needle marks, because according to what Broom told him, the medical team would withdraw the catheter partway and then reinsert it at a different angle, a procedure known as "fishing."

*Subsequent Litigation*

{¶ 17} Broom has pursued multiple avenues challenging any further attempt by the state to execute him. He filed a Section 1983 civil-rights complaint in the United States District Court for the Southern District of Ohio on September 18, 2009. He argued that a second attempt to execute him would violate the Eighth Amendment's prohibition on cruel and unusual punishments and the Fifth Amendment right against double jeopardy. The federal court dismissed these claims without prejudice as procedurally improper. *Broom v. Strickland*, S.D.Ohio No. 2:09-cv-823, 2010 WL 3447741 (Aug. 27, 2010). On the same day that he filed his Section 1983 complaint, Broom filed an original action for a writ of habeas corpus in this court (case No. 2009-1686), which he later voluntarily dismissed. *In re Broom*, 123 Ohio St.3d 1485, 2009-Ohio-5883, 916 N.E.2d 482. On September 14, 2010, Broom filed a federal habeas action, which is stayed pending exhaustion of his Eighth Amendment claim in state court, *Broom v. Bobby*, N.D.Ohio No. 1:10 CV 2058, 2010 WL 4806820 (Nov. 18, 2010), and a second state-court habeas action (case No. 2010-1609), which this court dismissed, *In re Broom*, 127 Ohio St.3d 1450, 2010-Ohio-5836, 937 N.E.2d 1039.

{¶ 18} On September 15, 2010, Broom filed a successive petition for postconviction relief in the Cuyahoga County Court of Common Pleas, asserting that any future attempt to execute him would be unconstitutional. On April 7, 2011,

the trial court denied Broom's petition without conducting an evidentiary hearing. The trial court held that a second execution attempt would not violate the Fifth or Eighth Amendment. And the court concluded that Broom's experience of repeated needle sticks, although "unpleasant," was not sufficiently torturous to implicate the Eighth Amendment.

{¶ 19} The Eighth District Court of Appeals affirmed on different grounds. Thereafter, the court denied Broom's request for en banc review. *State v. Broom*, 8th Dist. Cuyahoga No. 96747 (Apr. 5, 2012).

{¶ 20} Broom appealed to this court, and we accepted jurisdiction on three propositions of law:

> 1) The lower courts erred when they found that the Cruel and Unusual Punishments Clauses of the Eighth and Fourteenth Amendments to the United States Constitution, and Article I, Section 9 of the Ohio Constitution do not bar another attempt to execute Broom.

> 2) The lower courts denied Broom due process of law, an adequate corrective process, and his day in court on his "no multiple attempts" claims when [a] the trial court denied him discovery and a hearing, and [b] the appellate court, in a case of first impression and without prior notice to Broom, adopted a new case-specific and fact-based standard for adjudicating Broom's unique and rare constitutional claims, and then refused to remand the case to the trial court so that Broom could develop evidence and present argument that he meets that new standard.

> 3) The lower courts erred when they found that a second attempt to execute Broom would not violate the prohibitions against being placed twice in jeopardy for the same offense in the Fifth and

Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

*See* 139 Ohio St.3d 1403, 2014-Ohio-2245, 9 N.E.3d 1062.  For ease of discussion, we will address them out of order.

## Analysis

*Double Jeopardy*

{¶ 21} The Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb."  The Double Jeopardy Clause protects against three distinct evils: a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense.  *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), *overruled on other grounds*, *Alabama v. Smith*, 450 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989).  Ohio's constitutional prohibition on double jeopardy, Article I, Section 10, is coextensive with the federal clause.  *State v. Brewer*, 121 Ohio St.3d 202, 2009-Ohio-593, 903 N.E.2d 284, ¶ 14.

{¶ 22} Broom argues that a second execution attempt would be an unconstitutional second punishment.  He contends that for double-jeopardy purposes, the attempt to execute him began with the reading of the death warrant or at the very latest with the first insertion of a needle.  Broom claims that once the attempt to execute him began, he had a reasonable expectation in the "finality" of his death sentence, meaning that his death should have occurred on September 15, 2009, because R.C. 2949.22(B) requires that a death sentence shall be executed on the day designated by a court.  Because his life was once placed in "jeopardy" by virtue of the two hours of painful efforts to insert needles into his body, Broom argues, he may not again be required to undergo that same punishment.

**{¶ 23}** The court of appeals rejected this claim on the grounds that Broom has not yet been punished because his punishment is death: "An inmate can only be put to death once, and that process legislatively begins with the application of the lethal drugs." 2012-Ohio-587, ¶ 23, citing R.C. 2944.22(A). The court relied on *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947), in making this conclusion. In *Resweber*, Willie Francis was placed in the electric chair, but when the switch was thrown, there was a mechanical difficulty and death did not result. *Id.* at 460. A plurality of the United States Supreme Court held that a proposed second execution of Francis did not violate the Fifth, Eighth or Fourteenth Amendments. Because the court viewed the failed execution as an accident, it determined that the Double Jeopardy Clause did not preclude the state from carrying out the sentence. *Id.* at 463.

**{¶ 24}** The Eighth District noted that the *Resweber* dissenters "distinguished the application of electricity to the inmate from merely placing the inmate in the electric chair with no application of electricity." 2012-Ohio-587 at ¶ 22. By analogy, the court of appeals reasoned, the insertion of IV lines is merely a "preparatory" step to the execution. Until the lethal drugs flow through the tubes, the court reasoned, the state has not yet punished Broom within the meaning of the Fifth Amendment. *Id.* at ¶ 23. Thus, according to the court, the Double Jeopardy Clause has no application to multiple execution attempts. *Id*. at ¶ 25.

**{¶ 25}** The state agrees with the assessment of the court of appeals. It contends that when the preparatory actions proved unsuccessful, the state halted the execution and the imposed sentence was never carried out. Therefore, the state argues, a second attempt to carry out that sentence will not violate the Double Jeopardy Clause. The state cites R.C. 2949.22(A), which provides that "a death sentence shall be executed *by causing the application to the person*, upon whom the sentence was imposed, of *a lethal injection of a drug or combination of drugs*."

8

(Emphasis added.) The state reads this language to mean that the execution attempt does not begin until lethal force or measure is applied.

{¶ 26} We agree. There is no question that lethal drugs did not enter Broom's body. The execution attempt was halted after preparations to establish a viable IV line were unsuccessful. The establishment of viable IV lines is a necessary preliminary step, but it does not, by itself, place the prisoner at risk of death. As the statute makes clear, the execution commences when the lethal drug enters the IV line. In this case, because the attempt did not proceed to the point of injection of a lethal drug into the IV line, jeopardy never attached. Because there is no violation of the Fifth Amendment protection against double jeopardy, the state is not barred from a second attempt to execute Broom's death sentence.

*Due Process Concerns*

{¶ 27} In his second proposition of law, Broom raises two due-process concerns. First, he alleges that the trial court should have permitted him to conduct discovery and should have held a hearing on his petition for postconviction relief. Second, he argues that the Eighth District adopted a new standard—deliberate indifference—to analyze his petition and that the appellate court should have remanded the case to the trial court to hold a hearing under that standard.

Discovery and Hearing

{¶ 28} A postconviction proceeding is not an appeal of a criminal conviction but, rather, is a collateral, civil attack on a criminal judgment. *State v. Steffen*, 70 Ohio St.3d 399, 410, 639 N.E.2d 67 (1994). The right to file a postconviction petition is a statutory right, not a constitutional right. *State v. Calhoun*, 86 Ohio St.3d 279, 281, 714 N.E.2d 905 (1999). Thus, R.C. 2953.21 grants a petitioner only those rights specifically enumerated in its provisions and no more. *Calhoun* at 281. This court has never held that there is a right to discovery in postconviction proceedings. *See State ex rel. Love v. Cuyahoga Cty. Prosecutor's Office*, 87 Ohio St.3d 158, 159, 718 N.E.2d 426 (1999). And because

R.C. 2953.21 is silent about discovery, the decision to grant or deny a request for discovery rests with a trial court's sound discretion.

{¶ 29} An evidentiary hearing is not automatically guaranteed each time a defendant files a petition for postconviction relief. R.C. 2953.21(C) ("*Before* granting a hearing on a petition * * *, the court shall determine whether there are substantive grounds for relief" [emphasis added]). A trial court has the discretion to deny a postconviction petition without discovery or an evidentiary hearing if the petition, supporting affidavits, documentary evidence, and trial record do not demonstrate "sufficient operative facts to establish substantive grounds for relief." (Emphasis added.) *Calhoun* at paragraph two of the syllabus. To warrant an evidentiary hearing in a postconviction proceeding, a petitioner must submit evidence outside the record that sufficiently establishes that the petitioner is entitled to relief on one or more asserted constitutional grounds. R.C. 2953.21(A); *Calhoun* at 283.

{¶ 30} The decision to grant or deny a postconviction petition should be upheld absent an abuse of discretion, and a reviewing court should not overrule the trial court's determination if it is supported by competent and credible evidence. *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 58.

{¶ 31} Here, there is no indication that further discovery or a hearing is required. Broom submitted an affidavit and other documentary exhibits, deposition testimony from participants at his attempted execution and other transcripts from the federal proceeding in *Cooey v. Strickland*, case No. 04-cv-1156, and photographs of his puncture marks. There is no dispute as to any operative fact in connection with the events of September 14 and 15, 2009. Although he made a vague request in his postconviction petition for discovery and a hearing, a review of the docket shows that Broom never filed a discovery request while the matter was pending in the trial court. He also has failed to proffer what that additional discovery was or how a hearing would aid the trial court in resolving the legal

questions before it. We agree with the court of appeals that the trial court based its decision on the undisputed and voluminous evidence it had and that the trial judge did not abuse his discretion in denying Broom's petition without additional discovery or an evidentiary hearing. There is no need for remand on this issue.

Deliberate Indifference

**{¶ 32}** The trial court dismissed Broom's postconviction petition because, although "repeated needle sticks are indeed unpleasant, they are not torture" and because there was not a substantial risk of serious harm present. The Eighth District, however, used a different method of reasoning. After holding that multiple execution attempts do not per se constitute cruel and unusual punishment, 2012-Ohio-587 at ¶ 24, the majority opinion divided Broom's allegations into two categories: injuries allegedly sustained as a result of the state's following its execution protocol, and injuries allegedly sustained as a result of the state's deviating from its execution protocol. Treating the first category as a facial challenge to Ohio's execution protocol, the court of appeals rejected the challenge as untimely. *Id.* at ¶ 31 and 34. The court also cited federal-court decisions affirming the constitutionality of state lethal-injection protocols. *Id.* at ¶ 35, citing *Baze v. Rees*, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (affirming Kentucky's three-drug execution protocol); *Cooey*, 589 F.3d at 227-228 (holding that the failure to impose a time limit on the search for accessible veins did not make Ohio's protocol unconstitutional).

**{¶ 33}** The Eighth District then separately analyzed Broom's allegations that prison officials deviated from Ohio's execution protocol in his attempted execution using the conditions-of-confinement standard, which requires proof of the state official's subjective state of mind. 2012-Ohio-587 at ¶ 47-48.

**{¶ 34}** We disagree with this analysis. The process of carrying out an execution is more analogous to the method-of-execution cases than to conditions-of-confinement cases. Moreover, according to the plurality opinion in *Baze*, to

prevail on an Eighth Amendment claim based on a risk of future harm, "there must be a 'substantial risk of serious harm,' an '*objectively* intolerable risk of harm.' " (Emphasis added.) *Baze*, 553 U.S. at 50, 128 S.Ct. 1520, 170 L.Ed.2d 420, quoting *Farmer v. Brennan*, 511 U.S. 825, 842, 846, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), and fn. 9. This formulation appears irreconcilable with a requirement of proof of a prison official's subjective intent. *Jackson v. Danberg*, 594 F.3d 210, 223 (3d Cir.2010), fn. 16 (*Baze* does not incorporate deliberate-indifference language into method-of-execution cases).

{¶ 35} Although we do not agree with the Eighth District's use of the deliberate-indifference standard, the trial court properly relied on *Resweber* and *Baze* to shape its analysis. As there was no due-process violation, it is not necessary to remand for a further hearing.

*Cruel and Unusual Punishment*

The Eighth Amendment to the United States Constitution

{¶ 36} The Eighth Amendment to the United States Constitution states, "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The death penalty has been acknowledged as an acceptable form of punishment since the adoption of the U.S. Constitution and the Bill of Rights. *Glossip v. Gross*, __ U.S. __, 135 S.Ct. 2726, 2731, 192 L.Ed.2d 761 (2015). The United States Supreme Court has recognized that the Eighth Amendment prohibition on cruel and unusual punishments imposes two separate limitations. The first is a requirement of proportionality, *Miller v. Alabama*, __ U.S. __, 132 S.Ct. 2455, 2463, 183 L.Ed.2d 407 (2012), and the second is a prohibition against specific torturous methods of punishment, *Graham v. Florida*, 560 U.S. 48, 59, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010). Broom's challenge does not fit neatly into either category.

{¶ 37} In noncapital cases, the Eighth Amendment proportionality principle is narrow and " 'forbids only extreme sentences' " that are grossly disproportionate

to the crime. *Graham*, 560 U.S. at 59-60, quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring). In capital cases, proportionality analysis involves two subsets, "one considering the nature of the offense, the other considering the characteristics of the offender." *Id.* at 60. With respect to the nature of the offense, proportionality in capital cases merely stands for the proposition that the punishment must fit the crime. *See, e.g.*, *Kennedy v. Louisiana*, 554 U.S. 407, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008) (holding that an offender's death sentence for the rape of a child who did not die is unconstitutionally disproportionate).

{¶ 38} As for the second category, the United States Supreme Court has held that the death penalty is unconstitutionally disproportionate when imposed upon individuals whose personal characteristics diminish their personal moral responsibility for the crimes they have committed. *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (prohibiting the execution of juvenile offenders); *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (forbidding the execution of a defendant with intellectual disability). But Broom suggests no reason why his case might fall under this line of jurisprudence.

{¶ 39} With regard to method of execution, the United States Supreme Court has long held that punishments are cruel "when they involve torture or a lingering death," *In re Kemmler*, 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890), or when they "involve the unnecessary and wanton infliction of pain," *Rhodes v. Chapman*, 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), quoting *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). The United States Supreme Court has never struck down a specific execution method as cruel and unusual. Instead, the court has offered examples of execution methods that would constitute "torture or lingering death" as negative contrasts to a more humane method the court chose to affirm. For example, in affirming the constitutionality of execution by firing squad, the court contrasted the

practice with live disemboweling, beheading, and quartering; with burning alive; and with public dissection. *Wilkerson v. Utah*, 99 U.S. 130, 135, 25 L.Ed. 345 (1878); *see also In re Kemmler* at 446-447 (affirming the constitutionality of electrocution but stating that crucifixion and the breaking wheel would be cruel); *Baze v. Rees*, 553 U.S. 35, 94-99, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) (Thomas, J., concurring) (contrasting lethal injection to flaying, branding cheeks, dismemberment, cutting off hands or ears, and slitting nostrils).

{¶ 40} The foremost consideration, when analyzing a method of execution, is often the "objective evidence of the pain involved in the challenged method." *Campbell v. Wood*, 18 F.3d 662, 682 (9th Cir.1994); *accord Cooey v. Strickland*, 589 F.3d 210, 223 (6th Cir.2009). But pain is not necessarily the only indicator of cruelty. The Eighth Amendment also demands that a penalty accord with " 'the dignity of man.' " *Hope v. Pelzer* 536 U.S. 730, 738, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002), quoting *Trop v. Dulles*, 356 U.S. 86, 100, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (lead opinion).

{¶ 41} In its most recent method-of-execution case, the United States Supreme Court examined whether Oklahoma's lethal-injection protocol violated the Eighth Amendment. The court followed the plurality opinion in *Baze* and noted that a prisoner's challenge to a method of execution under the Eighth Amendment will fail unless the prisoner establishes that the method of execution presents a substantial risk of serious harm that is objectively intolerable and prevents prison officials from claiming that they were subjectively blameless. *Glossip*, 135 S.Ct. at 2737, 192 L.Ed.2d 761 (rejecting prisoners' claim for Eighth Amendment violation because they failed to establish a substantial risk of harm and a known and available alternative). It is not enough that a prisoner shows that there is a slightly or marginally safer alternative. Instead, the prisoner must identify an alternative that is " 'feasible, readily implemented, and in fact significantly

reduce[s] a substantial risk of severe pain.' " (Brackets sic.) *Id.*, quoting *Baze*, 553 U.S. at 52, 128 S.Ct. 1520, 170 L.Ed.2d 420.

{¶ 42} Broom's actual sentence of death is not at issue, nor does this case concern Ohio's chosen method of execution. Instead, Broom asserts that a second execution attempt would constitute cruel and unusual punishment. He claims that what he already experienced went beyond the time, pain, and emotional anguish involved in a "normal" execution. Because there is no guarantee of success, Broom contends, any further attempt to execute him would be cruel and unusual.

{¶ 43} Broom's claim has no precedent in Ohio. The United States Supreme Court, however, considered whether a failed execution attempt violated the Eighth Amendment in *Resweber*. After the mechanical difficulty with the electric chair failed to result in Francis's death, a new death warrant was issued. *Id.*, 329 U.S. at 460, 67 S.Ct. 374, 91 L.Ed. 422. Francis objected and argued that once he underwent "the psychological strain of preparation for electrocution," to require him to undergo the preparation a second time would subject him to lingering or cruel and unusual punishment. *Id.* at 464. A four-member plurality rejected this argument, because "[t]he cruelty against which the Constitution protects a convicted man is cruelty inherent in the *method of punishment*, not the necessary suffering involved in any method employed to extinguish life humanely." (Emphasis added.) *Id*. at 464.

{¶ 44} The dissenting justices noted that electrocution is statutorily and constitutionally permissible only if it is "so instantaneous and substantially painless that the punishment shall be reduced, as nearly as possible, to no more than that of death itself." *Id.* at 474 (Burton, J., dissenting). The dissenters rejected the prospect of execution by installments, what they termed "a delayed process of execution." *Id.* at 474-475.

{¶ 45} Justice Frankfurter cast the deciding vote. He joined the plurality to reject Francis's appeal because he did not believe that the Fourteenth Amendment

made the Bill of Rights applicable to the states.[1]  According to Justice Frankfurter, the Due Process Clause of the Fourteenth Amendment limited a state's criminal procedures only insofar as a state practice "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  *Id*. at 469 (Frankfurter, J., concurring), quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S.Ct. 330, 78 L.Ed. 674 (1934).  Justice Frankfurter did not believe that Louisiana's treatment of Francis rose to that level. As a result, Willie Francis went to the electric chair a second time.

**{¶ 46}** Based on *Resweber*, we determine, as did the Eighth District, that there is no per se prohibition against a second execution attempt based on the Cruel and Unusual Punishments Clause of the Eighth Amendment.  The state's intention in carrying out the execution is not to cause unnecessary physical pain or psychological harm, and the pain and emotional trauma Broom already experienced do not equate with the type of torture prohibited by the Eighth Amendment.

**{¶ 47}** Having determined that allowing the state to go forward with Broom's execution does not amount to a per se violation of the Eighth Amendment, we consider whether it is violated under the test set forth in *Glossip* and *Baze*. Broom argues that the state should have known of the potential problems with his execution beforehand.  He submitted evidence that the state experienced problems establishing and maintaining IV catheters during the previous executions of Joseph Clark and Christopher Newton and that problems should have been expected when Broom's first vein assessment indicated that there may be trouble accessing the veins.  But, it is unclear from the record why Broom's execution team was unable to establish IV access.  Although Dr. Heath suggested that it was poor technique, it

---

[1] The United States Supreme Court later repudiated Frankfurter's position:  The Due Process Clause of the Fourteenth Amendment does incorporate the Eighth Amendment's protections against cruel and unusual punishments against the states.  *Robinson v. California*, 370 U.S. 660, 666-667, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

is Broom's burden to establish that he is likely to suffer severe pain if required to undergo a second execution.

{¶ 48} Further, in December 2009, less than three months after the attempt to execute Broom, the Sixth Circuit rejected a constitutional challenge to Ohio's execution protocol, noting that "[s]peculations, or even proof, of medical negligence in the past or in the future are not sufficient to render a facially constitutionally sound protocol unconstitutional." *Cooey*, 589 F.3d at 225. The protocol that the Sixth Circuit reviewed in *Cooey* has been amended and we cannot assume that the same problems with IV access will befall Broom again.

{¶ 49} Broom also contends that the state's violation of the execution protocols indicates that prison officials were not blameless and created a substantial risk of harm. We agree that compliance with execution protocols is the best way to avoid the risk of severe pain, but deviation from a protocol is not an automatic constitutional violation. *See In re Ohio Execution Protocol Litigation (Wiles)*, 868 F.Supp.2d 625, 626 (S.D.Ohio 2012) (protections of the United States Constitution "do not require perfect adherence to every single provision of Ohio's execution protocol without deviation"). We are not convinced, however, that Broom has established that the state is likely to violate its execution protocol in the future.

{¶ 50} Following the events of September 15, 2009, the state was enjoined from carrying out the executions of Kenneth Smith and Charles Lorraine based in large part on the district court's determination that Ohio was not following its execution protocol. *See Cooey v. Kasich*, 801 F.Supp.2d 623 (S.D.Ohio 2011); *In re Ohio Execution Protocol Litigation (Lorraine)*, 840 F.Supp.2d 1044 (S.D.Ohio 2012).

{¶ 51} The state sought to address the concerns of the federal district court. It amended the protocol, adding a new command structure and forms that were required to be filled out as each step of the protocol was completed to ensure compliance. *In re Ohio Execution Protocol Litigation (Wiles)*, 868 F.Supp.2d 625,

629-632 (S.D.Ohio 2012). The state sufficiently demonstrated a commitment to follow the protocol and was allowed to proceed with the execution of Mark Wiles. *Id*. at 652. Several more executions occurred without any apparent violation of the protocol. *In re Ohio Execution Protocol Litigation (Phillips)*, S.D.Ohio No. 2:11-cv-1016, 2013 WL 5963150, *11-16 (Nov. 7, 2013). This led the district court to conclude that " 'Ohio does not have a perfect execution system, but it has a constitutional system that it appears to be following.' " *Id.*, quoting *In re Ohio Execution Protocol Litigation (Hartman)*, 906 F.Supp.2d 759, 791 (S.D.Ohio 2012).

{¶ 52} While we acknowledge that the state failed to follow the protocol in 2009, we cannot ignore what has transpired since then. The state has executed 21 death-row inmates since the attempted execution of Broom. *See* Ohio Department of Rehabilitation and Correction, *Ohio Executions—1999 to Present*, http://www.drc.ohio.gov/web/executed/executed25.htm (last updated Jan. 16, 2014).

{¶ 53} To be clear, the state must comply with the protocol as amended. Strict compliance with the protocol will ensure that executions are carried out in a constitutional manner and can also prevent or reveal an inmate's attempt to interfere with the execution process.[2] We simply are unable to conclude that Broom has

---

[2] At oral argument, the state speculated that Broom himself caused the difficulty in accessing his veins by taking antihistamines to dehydrate himself. There was also reference in the official timeline of Broom's execution that the "[m]edical team [was] having [a] problem maintaining an open vein due to past drug use." However, there is no evidence in the record supporting either allegation. We mention these allegations only to illustrate that following the current execution protocol could reveal potential problems with IV access. For instance, the protocol requires four vein checks and a review of the inmate's medical chart, which may include information regarding prior drug use. Ohio Department of Rehabilitation and Correction, *Policy No. 01-COM-11*, at 6, 9, 11, http://www.drc.ohio.gov/web/drc_policies/documents/01-COM-11.pdf (accessed Jan. 25, 2016). Also, after transfer to the Death House, the inmate is to be constantly monitored by at least three members of the execution team who are required to maintain an execution timeline. *Id.* at 9. The execution timeline is supposed to record certain specified events, such as the vein checks and other information at the discretion of the execution team. *Id.* at 2. And certainly, the ingestion of antihistamines should be a noteworthy event.

established that the state in carrying out a second attempt is likely to violate its protocol and cause severe pain.

{¶ 54} We therefore conclude that the Eighth Amendment does not bar the state from carrying out Broom's execution.

Article I, Section 9 of the Ohio Constitution

{¶ 55} Broom has also sought relief under the Ohio Constitution. Article I, Section 9 of the Ohio Constitution provides, "Excessive bail shall not be required; nor excessive fines imposed; nor cruel and unusual punishments inflicted." This court has long held that the Ohio Constitution is a "document of independent force." *Arnold v. Cleveland*, 67 Ohio St.3d 35, 616 N.E.2d 163 (1993), paragraph one of the syllabus. The U.S. Constitution provides a floor for individual rights and civil liberties, but state constitutions are free to accord greater protections. *Id*. And recently, this court held for the first time that Article I, Section 9 provides protection "independent of" the Eighth Amendment. *In re C.P.*, 131 Ohio St.3d 513, 2012-Ohio-1446, 967 N.E.2d 729, ¶ 59. But we have also noted that cases involving cruel and unusual punishments are rare, "limited to those involving sanctions which under the circumstances would be considered shocking to any reasonable person." *McDougle v. Maxwell*, 1 Ohio St.2d 68, 70, 203 N.E.2d 334 (1964).

{¶ 56} When the execution team was unable to establish IV lines, the attempt to execute Broom was halted. Because the lethal-injection drugs were never introduced into the IV lines, the execution was never commenced. The state also demonstrated in the executions that were conducted after September 2009 that it is committed to following the protocols as written. Because Broom's life was never at risk since the drugs were not introduced, and because the state is committed to carrying out executions in a constitutional manner, we do not believe that it would shock the public's conscience to allow the state to carry out Broom's execution. We therefore conclude that Article I, Section 9 of the Ohio Constitution does not bar the state from executing Broom's death sentence.

**Conclusion**

**{¶ 57}** The judgment of the Cuyahoga County Court of Appeals is affirmed.

Judgment affirmed.

O'CONNOR, C.J., and O'DONNELL and KENNEDY, JJ., concur.

FRENCH, J., dissents with an opinion in which PFEIFER, J., joins.

O'NEILL, J., dissents with an opinion.

_____

**FRENCH, J., dissenting.**

**{¶ 58}** The majority's decision to deny Romell Broom an evidentiary hearing on his Eighth Amendment claim is wrong on the law, wrong on the facts, and inconsistent in its reasoning. The majority adopts the trial court's conclusion that an evidentiary hearing is unnecessary because "[t]here is no dispute as to any operative fact in connection with the events of September 14 and 15, 2009." Majority opinion at ¶ 31. And then, with no apparent awareness of the contradiction, the majority rejects Broom's request for a hearing precisely because it finds an unresolved dispute of fact at the heart of the case, namely, the reason for the state's inability to establish IV access at the start of Broom's attempted execution.

**{¶ 59}** The court today holds that Broom is not entitled to an evidentiary hearing to prove his Eighth Amendment claim because he failed to prove his claim at the pleading stage; that is not the correct legal standard under R.C. 2953.21(E). The court then compounds its error by seeking evidence outside the record to prove that the state has cured the problems in its execution procedures and seizing on an execution protocol that is no longer in effect.

**{¶ 60}** For these reasons, I dissent.

**LEGAL FRAMEWORK**

**{¶ 61}** A method of execution violates the Eighth Amendment if it presents a risk that is sure or very likely to cause serious illness and needless suffering and

give rise to sufficiently imminent dangers. *Glossip v. Gross*, ___ U.S. ___, 135 S.Ct. 2726, 2737, 192 L.Ed.2d 761 (2015). "[T]here must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.' " *Baze v. Rees*, 553 U.S. 35, 50, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) (plurality opinion), quoting *Farmer v. Brennan*, 511 U.S. 825, 842, 846, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), and fn. 9. The controlling opinion in *Baze* recognized that a series of abortive execution attempts might demonstrate an objectively intolerable risk of harm. *Id.*

{¶ 62} The majority opinion offers two reasons why Broom supposedly failed to satisfy the *Glossip*/*Baze* formula; both are unpersuasive.

### 1. *Broom's evidence of a risk of serious harm*

{¶ 63} After reviewing the evidence from Broom's postconviction petition, the court opines that it is "unclear from the record why Broom's execution team was unable to establish IV access." Majority opinion at ¶ 47. The logic appears to be that if he cannot prove why the errors occurred, then he cannot prove that they will recur.

{¶ 64} The court's reasoning rests on a misapplication of a petitioner's burden of proof when filing a postconviction petition. Before granting a hearing on a petition, a trial court must consider whether it presents "substantive grounds for relief." R.C. 2953.21(C). A trial court acts within its discretion when it dismisses a petition without a hearing if the evidence and affidavits submitted by the petitioner fail to set forth " 'sufficient operative facts to establish substantive grounds for relief.' " *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 51, quoting *State v. Calhoun*, 86 Ohio St.3d 279, 714 N.E.2d 905 (1999), paragraph two of the syllabus.

{¶ 65} The requirement that a petitioner present "sufficient operative facts" in order to secure an evidentiary hearing does not mean that the facts presented

must be undisputed. The court's application of R.C. 2953.21(C) effectively eliminates the possibility of an evidentiary hearing in every case: either the petition fails to establish substantive grounds for relief, in which case the petitioner is not entitled to a hearing, or the evidence and affidavits establish grounds for relief beyond dispute, in which case an evidentiary hearing would be superfluous.

{¶ 66} When considered in its totality, Broom's petition contained sufficient operative facts to warrant a hearing. The evidence in the record, if believed, would establish that the state has repeatedly and predictably had problems establishing and maintaining access to inmates' veins, that these problems are the result of medical incompetence on the part of the execution team members responsible for inserting IV catheters, and that the incompetence of the execution staff makes it more than likely that these problems will recur in future executions.

{¶ 67} As the majority correctly notes, the execution team unsuccessfully inserted IV catheter needles into at least 18 separate injection sites on Broom's body, and the actual number of catheter insertions was much greater than the number of needle marks because injection sites were used multiple times. But the majority gives scant attention to the testimony of Dr. Heath concerning the magnitude of medical incompetence displayed or to evidence of the state's long, problematic history with IV catheters in lethal-injection procedures.

{¶ 68} As Dr. Heath explained, execution drugs are administered through a peripheral IV catheter, which consists of a hollow needle surrounded by a plastic tube called the catheter. The practitioner inserts both the needle and the catheter into the vein. Thus, although blood draws and IV catheters both involve needle pricks, the latter also includes the insertion of an object with a wider diameter.

{¶ 69} Dr. Heath testified that in Broom's case, the medical team inserted the catheters improperly and in a fashion likely to cause greater pain:

> And what [Broom] described did not sound right to me at all in terms of proper procedure. He described the depth into his muscle which they were pushing the catheter, going all the way up to the hub of the catheter, which is well over an inch deep, and going in at a very steep angle, which does not comport with proper technique or what's going to be a successful technique for getting a catheter into a vein.
>
> Q: And what kind of—what kind of response would a human body have to that kind of technique?
>
> A: It would hurt.

The fact that the medical team attempted to insert the catheter into Broom's arm in a nearly perpendicular line "bespeaks of bizarre and certainly poor technique" that had "no possibility of achieving insertion." Even the Lucasville physician inserted the catheter into Broom's ankle at the wrong angle, which is why she struck bone.

{¶ 70} On two occasions, after getting the catheter into Broom's veins, team members "botched up that relatively simple process of attaching the I.V. tubing into the hub of the catheter, and blood sprayed everywhere." Compounding the problem, the team member who inserted the catheter was not wearing gloves during the procedure, thereby increasing the risk of unsuccessfully attaching the tubing.

{¶ 71} Dr. Heath testified that clinical competence demands that attempts at peripheral IV access be abandoned long before the 19th attempt. The Lucasville physician agreed with this assessment, testifying that if she had known that 18 attempts had already been made on Broom, she never would have stuck him with a needle. And although it can be proper practice to "fish" a vein—partially withdrawing a catheter, then reinserting it at a different angle—it was "completely unacceptable [and] far beyond any acceptable standard" to have made as many

insertion attempts through the same needle holes as the medical team apparently did.

{¶ 72} The Broom execution attempt was not the first time the medical execution team had difficulty inserting an IV catheter. During Ohio's very first lethal injection, that of Wilford Berry in 1999, the medical team members responsible for the IV catheter line were unable to locate a vein in Berry's arm and had to call a third team member for assistance. When the state executed Christopher Newton in 2007, the medical team needed approximately 90 minutes to establish two IV lines. And during the 2009 execution of Marvallous Keene, the team had to switch to a backup line because they could not get fluid to flow.

{¶ 73} But the most disastrous execution prior to the attempted execution of Broom was that of Joseph Clark on May 2, 2006. Based on the end-of-the-day needle count in Clark's case, the execution team used 17 or 18 needles trying to establish two IV lines and never did manage to install the backup line before ultimately executing him. As in Broom's case, Dr. Heath was critical of the decision in Clark's case to continue fruitlessly trying to establish the IV, testifying that he would not subject a patient to more than six to ten attempts, because "any normal practitioner" will recognize by that point that the effort is futile and is only inflicting needless pain on the patient.

{¶ 74} Dr. Heath offered a simple explanation for the state's failures: incompetence. "[I]t is my opinion that the veins on Mr. Broom's arms, other areas of his body, should be easily accessible by a competent team." Part of the problem, he opined, arose from the fact that Ohio had lax standards regarding who may install a peripheral IV catheter during an execution. The person inserting the peripheral IV catheter should be someone who performs that task as part of his or her daily job duties. But Ohio's protocol required only one year of experience, with no limitation on how remote in time that experience might be.

**{¶ 75}** Team Member 9, who participated in the Broom procedure, is a phlebotomist. But drawing blood, which is what phlebotomists do, is a "much easier and simpler" process that is "far less fraught with problems" than inserting a catheter in order to inject drugs into the body. Dr. Heath testified that allowing a phlebotomist such as Member 9 to handle the insertion at an execution is "deeply inappropriate and reflects a deep misunderstanding and deep inability of what is needed to assemble an appropriate [execution] team."

**{¶ 76}** Nor was severe pain from inserting the IV catheter the only potential harm Dr. Heath identified. During the execution of Joseph Clark, a process known as infiltration occurred. "Infiltration" means the catheter needle is no longer in the vein, and the drug is being administered into tissue surrounding the vein. Infiltration of sodium thiopental may cause "very significant pain," either due to a pH imbalance or from the sudden accumulation of fluid in the tissue.

**{¶ 77}** The protocol in effect at the time of Broom's attempted execution called for administration of sodium thiopental as the first of three drugs. The current protocol, effective June 29, 2015, permits the use of sodium thiopental at the discretion of the warden. Ohio Department of Rehabilitation and Correction, *Policy No. 01-COM-11*, at 15, http://www.drc.ohio.gov/web/drc_policies /documents/01-COM-11.pdf ("Current Protocol") (accessed Feb. 29, 2016). But there is no evidence in the record to indicate whether infiltration is a sign of negligence or merely an unavoidable risk, even if performed by the most skilled practitioners.

**{¶ 78}** In the face of this evidence, it is disingenuous to dismiss Broom's petition on the grounds that it is "unclear" why the execution team was unable to establish IV access. The majority opinion cites no evidence in the record for an alternative explanation of the state's failure, nor could it, given that the state failed to submit any evidence. And if the majority truly believes that the cause is unclear, that is all the more reason to have an evidentiary hearing to resolve the question.

**{¶ 79}** Nor does the majority explain its conclusory assertion that Broom failed to establish a likelihood that he will suffer severe pain in the future. There is no evidence in the record to suggest that the state has improved the training of its execution team members or increased the certification requirements to perform these tasks. In fact, Ohio's current execution protocol still requires only one year of experience.[3] If the state cannot explain why the Broom execution went wrong, then the state cannot guarantee that the outcome will be different next time.

### 2. *Ohio's current execution protocol*

**{¶ 80}** In an attempt to bolster its conclusion, the majority reaches outside the record for evidence that the state has improved its execution procedures. Specifically, it cites the Sixth Circuit's decision in *Cooey v. Strickland*, 589 F.3d 210 (6th Cir.2009), for the proposition that Ohio's current execution protocol passes constitutional muster. Therefore, the majority asserts, "we cannot assume that the same problems with IV access will befall Broom again." Majority opinion at ¶ 48. This argument misunderstands *Cooey* and improperly shifts the burden of proof.

**{¶ 81}** As explained in *Cooey*, in the aftermath of Broom's attempted execution, the state made two changes to its execution protocol. First, it switched from a three-drug protocol to a one-drug protocol. *Id*. at 215. But since the one drug was still administered intravenously, *id*. at 219, this change did nothing to remedy the problem of incompetent insertion of IV catheters.

**{¶ 82}** Second, the new protocol authorized a two-drug, intramuscular injection as a backup procedure if the execution team cannot obtain IV access. Specifically, if the warden and director determine that IV injections cannot or should not be used, then the state may administer an injection of midazolam and

---

[3] *See* Current Protocol at 2.

hydromorphone intramuscularly. *Id*. at 220. But in January 2015, five years after *Cooey*, the state removed midazolam and hydromorphone from its execution protocol.[4] And that leaves the state back where it began, with a protocol that mandates intravenous injection and provides no intramuscular backup.[5]

{¶ 83} The majority opinion notes that the amended protocol added "a new command structure and forms that were required to be filled out as each step of the protocol was completed." Majority opinion at ¶ 51. It cites *In re Ohio Execution Protocol Litigation* (*Wiles*), 868 F.Supp.2d 625 (S.D.Ohio 2012), for the proposition that the state "sufficiently demonstrated a commitment to follow the protocol" to persuade the federal court to allow executions to proceed. Majority opinion at ¶ 51. And it concludes by announcing that this court is "not convinced * * * that Broom has established that the state is likely to violate its execution protocol in the future." *Id.* at ¶ 49. The majority's reasoning is faulty for three reasons.

{¶ 84} First, the majority opinion does not explain how the new command structure in the amended protocol will remedy the problem of medical incompetence identified in Broom's petition. Additional paperwork will not improve the execution team's ability to insert an IV catheter.

{¶ 85} Second, *Wiles* addressed whether the state was violating the Equal Protection Clause in its administration of its lethal-injection protocol, not the Eighth Amendment. 868 F.Supp.2d at 636-637. The district court observed "a consistent pattern of arbitrary deviations from the protocol." *Id*. at 640. In the context of an Equal Protection claim, the state's assurances that it would strictly comply with written procedures in the future was relevant. But *Wiles* is irrelevant to Broom's claim under the Eighth Amendment.

---

[4] Ohio Department of Rehabilitation and Correction, *Ohio Revises Lethal Injection Protocol*, http://www.drc.ohio.gov/Public/press/press436.htm (accessed Feb. 29, 2016).
[5] *See* Current Protocol at 15-16.

**{¶ 86}** Third, the majority's assertion that Broom failed to prove that the state will deviate in the future is deeply unfair. Assuming that the written protocol is even relevant (which it is not), the state's assurance of future compliance is in essence an affirmative defense. The majority is effectively shifting the burden of proof by faulting Broom for not rebutting evidence that the state did not even introduce into the record. And when exactly was Broom supposed to introduce such evidence? All the evidence in the record comes from the postconviction petition filed September 15, 2010. The majority relies on subsequent events and documents not contained in the record. If the majority truly believes that recent events are relevant to adjudicating Broom's petition, the answer is to remand the petition for an evidentiary hearing, not for this court to make its own assessment without a record or input from the parties.

## CONCLUSION

**{¶ 87}** We should remand Broom's case to the trial court for an evidentiary hearing. With this disposition, it is unnecessary and premature for the court to address any other legal questions. I dissent.

PFEIFER, J., concurs in the foregoing opinion.

_____

**O'NEILL, J., dissenting.**

**{¶ 88}** Respectfully, I must dissent.

**{¶ 89}** Shortly after I joined this court in 2013, we granted a motion to set an execution date for Jeffrey A. Wogenstahl. *State v. Wogenstahl*, 134 Ohio St.3d 1437, 2013-Ohio-164, 981 N.E.2d 900. I dissented from the scheduling order on the theory that capital punishment violates the Eighth Amendment to the Constitution of the United States and Article I, Section 9 of the Ohio Constitution. *Id.* at ¶ 2. Appellant Romell Broom's first execution date—a botched attempt— was the example I offered to support my belief that even lethal injection is a cruel

28

punishment on par with the "decapitations, hangings, and brandings" that were common in a less civilized time. *Id.* at ¶ 3-6.

{¶ 90} We have now come full circle. Broom is here once again on review of a successive petition for postconviction relief arguing, among other things, that a second execution attempt would constitute cruel and unusual punishment. Clearly, it would.

{¶ 91} The majority's description of the state's first attempt to put Broom to death chills me to the core. It is not only the rights of the defendant that are in play here. There are state employees who have tragically endured the personal trauma of unsuccessfully attempting to execute a fellow human being. And now we, as a society, are telling them, "Do it again." I can only imagine the apprehension Broom and his executioners must be feeling now as they prepare for and await a second attempt.

{¶ 92} Once again, this case demonstrates that the term "lethal injection" is merely a convenient euphemism used to aid in turning a blind eye to the real possibility that execution procedures can and do go wrong with predictable and horrendous results. The phrase itself implies a sanitized death unlike the stories told in the media about Broom, Dennis McGuire, Charles Warner, Clayton Lockett, and others.[6] The record is clear that Broom was poked repeatedly with a needle

---

[6] The Christian Science Monitor reported in 2010 that "Broom was stuck with needles at least 18 times over the course of two hours" and that "[t]hat incident followed two others in Ohio during the past three years, both of which involved difficulties inserting the IV." Guarino, *Ohio Execution Set in Case that Changed Lethal Injection Process*, Christian Science Monitor (Mar. 16, 2010), http://www.csmonitor.com/USA/Justice/2010/0316/Ohio-execution-set-in-case-that-changed-lethal-injection-process (accessed Mar. 1, 2016). Ohio inmate Dennis McGuire "experienced 'true pain and suffering' " during his successful execution as he "gasped, choked, clenched his fists and appeared to struggle against his restraints for about 10 minutes * * * before being pronounced dead." Johnson, *Dennis McGuire's Execution Was Not 'Humane,' Doctor Says*, Columbus Dispatch (Aug. 13, 2014), http://www.dispatch.com/content/stories/local/2014/08/12/inmate-suffered-pain-during-execution-doctor-says.html (accessed Mar. 1, 2016), quoting a California anesthesiologist's sworn statement from a civil suit filed by McGuire's children. In Oklahoma, Charles Warner suffered five attempts at IV insertion and then exclaimed, "My body is on fire," after executioners injected him

and that pain was unquestionably inflicted, not unlike procedures that have been recognized as torture in the past. *See Wilkerson v. Utah*, 99 U.S. 130, 135, 25 L.Ed. 345 (1878) (public dissection is torture); *Baze v. Rees*, 553 U.S. 35, 94-99, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) (Thomas, J., concurring) (dismemberment, cutting off hands or ears, and slitting nostrils are torture). Any fair reading of the record of the first execution attempt shows that Broom was actually tortured the first time. Now we embark on the task of doing it again.

{¶ 93} Today we have the rare opportunity to address not just the cruelty inherent in putting someone to death once—this case is about the second try. Incredibly, the majority cites the case of Willie Francis as support for its determination that the state does not violate the Eighth Amendment by undertaking a second execution attempt. Majority opinion at ¶ 23. Francis may be the only other individual in the recent history of our nation who survived a first attempt at imposing the death penalty only to be successfully executed on the second attempt. I absolutely reject using the Francis case in defense of our tortured American history involving the death penalty. His very conviction is a look into the true tragedy of all executions in America. For let us not forget—ignoring the present case for the moment—that our national record is replete with examples of innocent people being executed. The Willie Francis case, tragically relied upon by the

---

with the wrong drug. Gajanan, *Oklahoma Used Wrong Drug in Charles Warner's Execution, Autopsy Report Says*, The Guardian (Oct. 8, 2015), http://www.theguardian.com/us-news/2015/oct/08/oklahoma-wrong-drug-execution-charles-warner (accessed Mar. 1, 2016). Clayton Lockett also suffered more than a dozen painful attempts at IV insertion. Stern, *The Cruel and Unusual Execution of Clayton Lockett*, The Atlantic (June 2015), http://www.theatlantic.com/magazine/archive/2015/06/execution-clayton-lockett/392069/ (accessed Mar. 1, 2016). The drugs ultimately were administered to Lockett through an IV that had dislodged from his vein. Consequently, the drugs pooled under his skin and entered his bloodstream more slowly, and he received only a partial dose of the sedative midazolam before he died. In the meantime, Lockett was able to wake up, struggle with his restraints strongly enough to cause "blunt-impact injuries" to himself, and managed to say the word "Man" among other, incoherent mumbling. *Id.* Lockett died "slowly and in apparent agony" while the medical team attempted to reinsert his IV. *Id.*

majority for the proposition that a second execution attempt is not on its face constitutionally defective, magnifies the problems of cruelty and racial injustice in one package and offers at once an instructive example of both the progress and regression of our justice system.

{¶ 94} If Willie Francis had been tried for his alleged crime today, he would not have been sent to the electric chair the first time. Francis was a 17-year-old black male in Louisiana on May 3, 1946, the first time the state attempted to put him to death. Miller & Bowman, *Death by Installments: The Ordeal of Willie Francis* 1, 20 (1988). He had been convicted by an all-white, all-male jury. *Id.* at 24. Six days after being appointed, his attorneys put up no defense despite a glaring lack of evidence. *Id.* at 23-26. Let me repeat that—this black teenager's court-appointed attorneys offered no defense in a death-penalty case in the Deep South just after World War II. The State of Louisiana used two probably coerced confessions that were inconsistent with forensic evidence and the story of the only eyewitness to the murder. *Id.* at 23-26. He received a mandatory death sentence and was not informed of his rights to appeal or to appointed counsel for that purpose. *Id.* at 26-27. There was no appeal of his conviction or sentence. *Id.* And this is the case the majority relies upon to suggest that due process is alive and well in Ohio.

{¶ 95} Since Francis was convicted and executed, our ideas of the Constitution have evolved substantially. Courts now recognize that it is a cruel and unusual punishment to execute a minor. *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). The right to a jury trial has evolved such that under current law, Francis could have challenged the selection of his all-white, all-male jury as well as the makeup of the pool from which the jurors were selected. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975); *Alexander v. Louisiana*, 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). The right to

counsel has evolved to the point where Francis's conviction would have been overturned as a result of counsel's objectively unreasonable choice not to defend, and he would have had appellate counsel to argue that issue for him. *See Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). Mandatory death sentences, like the one Francis was given, are now unconstitutional. *Sumner v. Shuman*, 483 U.S. 66, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987). In all of these ways, our conception of the United States Constitution has evolved. I wonder when concepts of human dignity will evolve sufficiently that the State of Ohio will lay down the death penalty entirely just like the more obvious forms of torture that have been abandoned so far. *See, e.g.*, *Kennedy v. Louisiana*, 554 U.S. 407, 419, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008) ("The [Eighth] Amendment 'draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society,' " quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (lead opinion)). This is because "[t]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change." *Furman v. Georgia*, 408 U.S. 238, 382, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Burger, C. J., dissenting).

{¶ 96} On the precise question before this court—whether a second execution attempt violates the Eighth Amendment—the United States Supreme Court issued a fractured judgment resting entirely on a discredited theory of our Constitution. Francis was put to death with four justices agreeing with his Eighth Amendment argument, four disagreeing, and one justice believing that the Eighth Amendment did not apply to the states through the Fourteenth Amendment. *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 472, 67 S.Ct. 374, 91 L.Ed. 422 (1947) (Burton, J., joined by Douglas, Murphy, and Rutledge, JJ., dissenting); *id.* at 464 (lead opinion); *id.* at 469-470 (Frankfurter J., concurring). Our

jurisprudence has evolved on this point as well, and the Eighth Amendment was formally incorporated in the Fourteenth Amendment as a limitation upon the power of the states. *Robinson v. California*, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

**{¶ 97}** Despite the quirk of constitutional theory that the judgment of the *Francis* court rests on, five of the justices were able to recognize the second execution attempt for what it was: torture. *Resweber* at 471 (Frankfurter J., concurring) ("Strongly drawn as I am to some of the sentiments expressed by my brother Burton, * * * were I to [join the dissenting opinion,] I would be enforcing my private view rather than that consensus of society's opinion which, for purposes of due process, is the standard enjoined by the Constitution"); *id.* at 476-477 (Burton J., dissenting) ("[T]oday, two separated applications [of electricity] are sufficiently 'cruel and unusual' to be prohibited"); Miller & Bowman at 125-127 and fn. 18 (the Willie Francis case weighed "so heavily on [Justice Frankfurter's] conscience" that he convinced a former Harvard law school classmate, a leading member of the Louisiana bar, to seek clemency on Francis's behalf), quoting Justice Burton's papers, box 171, available in Library of Congress. In this way, we have regressed.

**{¶ 98}** I believe as a moral and constitutional matter that subjecting Broom to a second execution attempt after even one extremely painful and unsuccessful attempt is precisely the sort of "lingering death" that the United States Supreme Court recognized as cruel within the meaning of the Eighth Amendment 125 years ago. *In re Kemmler*, 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890). For that reason, I would reverse the judgment of the court of appeals.

**{¶ 99}** Consequently, I dissent.

_____

Timothy J. McGinty, Cuyahoga County Prosecuting Attorney, and Katherine Mullin and T. Allan Regas, Assistant Prosecuting Attorneys, for appellee.

S. Adele Shank and Timothy F. Sweeney, for appellant.

Timothy Young, Ohio Public Defender, and Rachel Troutman, Supervisor, Death Penalty Division, urging reversal for amicus curiae, Office of the Ohio Public Defender.

_____